UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RACHELLE C. MOELLERING,      )
                                   )
               Plaintiff,       )
                                   )
             v.             )      No.  4:13CV1837 ACL
                                   )
CAROLYN W. COLVIN, Acting   )
Commissioner of Social Security,  )
                                   )
           Defendant.    )

## MEMORANDUM AND ORDER

Plaintiff Rachelle C. Moellering brings this action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). Because the Commissioner's final decision is not supported by substantial evidence on the record as a whole, it is reversed.

## I. Procedural History

On May 8, 2010, plaintiff filed her application for DIB in which she claimed she became disabled on August 1, 2008, because of obsessive compulsive disorder (OCD), bipolar disorder, anxiety, depression, impairments of the lumbar and cervical spine, bilateral knee impairments, seizures/epilepsy, and connective tissue

disorder.  Plaintiff was thirty-six years of age at the time she filed her application.  (Tr. 269-70, 296.)  The Social Security Administration denied the application on July 30, 2010.  (Tr. 154, 179-83.)  Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on December 1, 2011, at which plaintiff testified.  (Tr. 134-47.)   A supplemental hearing was held on January 3, 2012, at which plaintiff and a vocational expert testified.  (Tr. 100-33.)  On March 20, 2012, the ALJ denied plaintiff's claim for benefits, finding plaintiff able to perform work as it existed in significant numbers in the national economy.  (Tr. 156-70.)  On May 28, 2013, upon consideration of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 8-13.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole.  Plaintiff specifically argues that the ALJ improperly discounted the medical opinions rendered by her treating healthcare providers and erred in determining her credibility.  Plaintiff requests that the final decision be reversed and that she be awarded benefits or that the matter be remanded for further consideration.  For the reasons that follow, the matter will be remanded.

## II. Testimonial Evidence Before the ALJ

A.  <u>Hearing Held December 1, 2011</u>

At the hearing on December 1, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff lives with her boyfriend; two of her three children, ages seventeen and three; two of her boyfriend's children, ages fourteen and ten; and a seventeen-year-old boy who stays with them occasionally. Plaintiff attended college but did not complete a semester. Plaintiff also received training as a certified personal trainer and a CNA, but her certification lapsed. (Tr. 137-38.)

Plaintiff's Work History Report shows plaintiff to have worked in office management at True Fitness from September 1997 to August 2008. (Tr. 325.) Prior to such work, and specifically from April to September 1997, plaintiff worked as a bar and restaurant manager at a country club. (Tr. 138-39.) Plaintiff received unemployment benefits in late 2008 to early 2009. (Tr. 140.)

Plaintiff testified that she was recently hospitalized for two days in October after an attempted suicide. Plaintiff testified that she otherwise receives outpatient therapy for suicidal thoughts. (Tr. 141.)

Plaintiff testified that she currently takes Oxycontin as prescribed by her physician. Plaintiff previously took Oxycontin that her mother-in-law had given her for pain. (Tr. 141-42.)

The ALJ recessed the hearing until a later date to provide plaintiff's counsel the opportunity to submit additional medical evidence.  (Tr. 146.)

B.    Hearing Held on January 3, 2012

1.    *Plaintiff's Testimony*

At the hearing on January 3, 2012, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff testified that she lives with her boyfriend; her three children, ages seventeen, fifteen, and three; and her boyfriend's two children, ages fourteen and ten.  (Tr. 104.)

Plaintiff testified that she has connective tissue disease affecting her joints, which causes her to experience pain every day.  Plaintiff testified that the pain in her hands, ankles, and knees is constant and she awakens with all-over stiffness every morning.  Plaintiff testified that the pain sometimes awakens her at night.  Plaintiff testified that she began seeing her rheumatologist, Dr. Garriga, in 2008 after blood tests yielded questionable results.  Plaintiff testified that she continues to see Dr. Garriga and that he recently changed her medication.  Plaintiff's medication helps enough for her to take care of her daughter.  (Tr. 109, 111.)

Plaintiff testified that she experiences pain when she walks.  She can walk enough to be able to clean her house, but cannot walk a mile.  Plaintiff cannot get down on her hands and knees, nor can she lift her three-year-old daughter.

Plaintiff testified that she has experienced these limitations for nearly two years. Plaintiff testified that she experiences pain, numbness, and burning in her hands such that she cannot grip, type, or write. Plaintiff tries to type on her computer at home to prepare personal journals, but can only do so for about five minutes because of her limitations. Plaintiff testified that her psychiatrist and counselor suggested that she engage in such journaling to help with her mental impairments. (Tr. 110-12.)

Plaintiff testified that she has bipolar disorder and that most days begin with depressive symptoms. Plaintiff testified that she is in deep depression most days and breaks down and cries when she is alone. Plaintiff stays in bed some days and will get up only to prepare meals for her daughter and to take care of the child. Plaintiff sometimes stays in her pajamas all day and fails to take a shower. Plaintiff testified that she experiences manic episodes once every two or three weeks. Plaintiff testified that she has racing thoughts and rapid speech during these episodes and feels that she does not make any sense. Plaintiff also gets bursts of energy and becomes overly playful. Plaintiff testified that she is irritating to other people during these episodes. (Tr. 116-17, 120-21.)

Plaintiff testified that she also has OCD, which interferes with her sleep at night. Plaintiff testified that with such condition, she has the compulsion to flush toilets, keep things clean, and repeatedly check to make sure the doors are locked.

Plaintiff testified to being terrified that someone may break in, or that her daughter may try to walk out of the house.  (Tr. 118-19.)

Plaintiff testified that she has difficulty completing tasks because she forgets about whatever it is she is doing.  Plaintiff testified that things do not get done or even attempted if they are not written down.  (Tr. 119-21.)

Plaintiff testified that she has been seeing her psychiatrist, Dr. Malik, for twelve to fifteen years.  (Tr. 122.)  Plaintiff sees her counselor, Ms. Wessler, every week.  (Tr. 112-13.)

As to her daily activities, plaintiff testified that she wakes up between 5:30 and 6:00 a.m. so that her boyfriend can help her get out of bed.  Otherwise, plaintiff has physical difficulty getting out of bed by herself.  Plaintiff testified that she then takes her medication and waits for it to take effect so that she can prepare breakfast for her daughter when she wakes up.  (Tr. 116-17.)  Plaintiff testified that her goal every day is to make sure her house is clean, the laundry is done, and the meals are cooked.  Plaintiff presses herself to get these things done, but sometimes is unable to.  (Tr. 118.)  Plaintiff does not watch television and no longer reads books, because she has many thoughts going through her mind.  (Tr. 121-22.)

2.    *Testimony of Vocational Expert*

Ms. Diederman, a vocational expert, testified at the hearing on January 3, 2012, in response to questions posed by the ALJ and counsel.

Ms. Diederman classified plaintiff's past work as a bar and restaurant manager as light and skilled, and as an office manager as sedentary and skilled. (Tr. 125-26.)

The ALJ asked Ms. Diederman to consider that plaintiff was limited to light and unskilled work with the additional limitations that she should not work in a setting that includes constant, regular contact with the general public, and she should not perform work that includes more than infrequent handling of customer complaints. Ms. Diederman testified that plaintiff would not be able to perform her past relevant work with these limitations. Ms. Diederman testified that a person with such characteristics could perform other work, however, such as production assembler, of which 8,000 such jobs exist in the State of Missouri and 280,000 nationally; housekeeping, of which 2,200 such jobs exist in the State of Missouri and 50,000 nationally; and folding machine operator, of which 250 such jobs exist in the State of Missouri and 12,000 nationally. (Tr. 126-27.)

Counsel asked Ms. Diederman to consider an individual limited to sedentary, unskilled work with additional limitations of no reaching, only occasional fine and gross manipulation, no public contact, and only occasional contact with coworkers and supervisors. Ms. Diederman testified that no occupational base exists for such a person. (Tr. 128.)

Counsel then asked Ms. Diederman to consider the individual described by

the ALJ, and that such individual was further limited in that she was unable to maintain attention and focus for a consistent two-hour period and would be off task for ten minutes during every hour of work. Ms. Diederman testified that being non-productive for ten minutes at a time every hour would preclude competitive employment. (Tr. 129-31.) Ms. Diederman testified that missing work at least three days a month in an unskilled position would also preclude competitive employment, but that some employers may be more flexible with persons missing two days of work each month. (Tr. 131-32.)

### III. Relevant Medical Records Before the ALJ

The medical record in this case begins in August 2007 with plaintiff's visit to Dr. Raafea Malik, a psychiatrist, for continued treatment relating to her diagnosed conditions of bulimia nervosa and bipolar disorder. Between August 2007 and February 2008, plaintiff visited Dr. Malik on five occasions and was prescribed various medications for her conditions, including Zoloft,[1] Ambien,[2] Seroquel,[3] and Requip.[4] Sleep difficulties were noted throughout this period, but Dr. Malik noted plaintiff's mood to be relatively stable with isolated exacerbations

---

[1] Zoloft is used to treat depression, OCD, panic attacks, and social anxiety disorder. *Medline Plus* (last revised Apr. 13, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048. html>.

[2] Ambien is used to treat insomnia. *Medline Plus* (last revised Sept. 15, 2013)<http://www.nlm. nih.gov/medlineplus/druginfo/meds/a693025.html>.

[3] Seroquel is used to treat bipolar disorder and schizophrenia. *Medline Plus* (last revised Apr. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html>.

[4] Requip is used to treat restless legs syndrome (RLS). *Medline Plus* (last revised Aug. 15, 2013)

of symptoms, including irritability.  (Tr. 490-93.)

In April 2008, plaintiff underwent examination in relation to her pregnancy. Dr. Jessica Stafford noted plaintiff to have chronically used medications that caused weight gain, specifically Ambien and Seroquel, and that she had a history of bulimia, compulsive exercise, depression, and bipolar disorder.  It was also noted that plaintiff no longer exercised, because of difficulty walking and swelling in her legs.  Plaintiff was given instructions regarding nutrition and she was encouraged to talk to her physician regarding her medications.  (Tr. 365.)

Plaintiff returned to Dr. Malik on May 27, 2008, and reported having periods of feeling more down.  An increase in obsessive thinking was also noted.  Plaintiff reported having increased dreams relating to anxiety about the newborn.  It was noted that being off of work had helped.  Dr. Malik continued plaintiff's diagnosis of bipolar disorder and instructed plaintiff to continue with Seroquel, Zoloft, and Ambien.  (Tr. 489-90.)

On July 1, 2008, plaintiff reported to Dr. Malik that she had been experiencing increased mood swings, irritability, and emotional lability.  Plaintiff denied any persistent symptoms of depression, mania, or psychosis.  Plaintiff also denied any excessive symptoms of OCD, but reported having anxiety about her baby.  Plaintiff also reported that she could not sleep without taking Ambien.

---

<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698013.html>.

Plaintiff was continued in her diagnosis and medication regimen. (Tr. 489.)

Plaintiff delivered her baby on July 31, 2008. (Tr. 377-80.)

Plaintiff returned to Dr. Malik on August 26, 2008, and reported feeling overwhelmed, having increased anxiety, and being obsessive and over-protective of her baby. Plaintiff also reported decreased sleep because of worry and symptoms of restless leg syndrome (RLS). Plaintiff was continued in her diagnosis and medication regimen. She was instructed to restart Requip. (Tr. 488.)

On October 24, 2008, plaintiff reported to Dr. Malik that she was feeling more tired and experienced extreme fatigue every day. Plaintiff also reported that her mind was racing, which caused difficulty falling asleep. Plaintiff denied any excessive irritability or symptoms of hypermania. Plaintiff reported being obsessive and anxious about leaving the baby alone. Plaintiff was prescribed Zyprexa,[5] Ambien, Zoloft, and Requip and was instructed to increase her dosage of Seroquel. (Tr. 488.)

Plaintiff returned to Dr. Malik on February 19, 2009. Dr. Malik noted plaintiff to report that her mood was mostly stable, but that she had racing thoughts that interfered with her sleep, felt anxious and overwhelmed, had knots in her stomach, and was obsessively worried. Plaintiff reported increased symptoms of

---

[5] Zyprexa is used to treat bipolar disorder and schizophrenia. *Medline Plus* (last revised Aug. 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601213.html>.

RLS that also interfered with her sleep. Plaintiff had no manic symptoms. Plaintiff was able to exercise and had lost fifty pounds. Dr. Malik diagnosed plaintiff with bipolar disorder, OCD, and RLS. Plaintiff was instructed to increase Zoloft and Requip and to continue with Seroquel and Ambien. (Tr. 487.)

On April 28, 2009, plaintiff reported to Dr. Malik that she had relief of her RLS symptoms and that her sleep quality had improved. Plaintiff reported having periods of feeling down and continued periods of obsessive thoughts and excessive anxiety. Plaintiff denied any impulsivity or hypermanic episodes. Plaintiff reported being frustrated with her inability to lose more weight despite continued exercise. Plaintiff was diagnosed with bipolar disorder and OCD, and Lamictal[6] was added to her medication regimen. (Tr. 487.)

Plaintiff visited Family Nurse Practitioner Janelle S. Carron on June 8, 2009, with complaints associated with asthma and bronchitis. Plaintiff also requested a refill of Percocet[7] for chronic back pain. Medrol-Dosepak[8] was prescribed. A referral to pain management was considered. (Tr. 412-17.)

---

[6] Lamictal is an anticonvulsant used to treat bipolar disorder. *Medline Plus* (last revised Feb. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html>.

[7] Percocet is a combination of acetaminophen and oxycodone used to relieve moderate to severe pain. *Medline Plus* (last revised Oct. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html>.

[8] Medrol is used to relieve inflammation and treat certain forms of arthritis as well as severe allergies and asthma. *Medline Plus* (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html>.

Plaintiff visited Dr. Chad J. Smith[9] on August 21, 2009, with complaints of chronic pain in the neck/shoulder region and lower back; occasional dizzy spells; and diffuse joint pains. Plaintiff's current medications were noted to include Requip, Lamictal, Percocet, Medrol-Dosepak, Zoloft, and Seroquel. Physical examination showed plaintiff to have normal range of motion about the cervical and lumbar spine. Soft tissue tenderness was noted at the lower lumbar region and about the bilateral paraspinal regions of the lower neck. Straight leg raising was negative. Plaintiff had normal motor and sensory functions. No joint swelling or deformities were noted. Dr. Smith diagnosed plaintiff with dizziness, low back pain, cervicalgia, and polyarthralgia. Osteopathic manipulative treatment was administered to the lumbar, thoracic, and cervical regions. Dr. Smith opined that most of plaintiff's neck and lower back etiologies were likely mechanical in nature. Laboratory testing was ordered. (Tr. 403-07.)

Blood tests dated August 25, 2009, yielded positive antinuclear antibody (ANA) results.[10] Dr. Smith determined that such results, coupled with plaintiff's joint symptoms, warranted a referral to Dr. Garriga, a rheumatologist. (Tr. 431.)

Plaintiff visited Dr. Francisco J. Garriga on September 18, 2009, with complaints of stiffness and pain in her neck, shoulders, lower back, right wrist, and

---

[9] Dr. Smith is referred to in the record as plaintiff's pain specialist.

[10] The ANA test is used as a primary test to help evaluate a person for autoimmune disorders. *ANA*, American Ass'n for Clinical Chemistry (last reviewed Apr. 30, 2014)<http://labtestsonline.org/understanding/analytes/ana/tab/test>.

right knee.  Dr. Garriga noted plaintiff to be taking medication for depression.

Physical examination of the joints was normal in all respects.  No swollen joints

were noted.  Dr. Garriga noted plaintiff's positive ANA as well as positive Scl-70[11]

and determined there to be enough suggestion of an autoimmune disease.

Prednisone[12] was prescribed.  (Tr. 446-47.)

On October 30, 2009, plaintiff reported to Dr. Garriga that she experiences

stiffness all day, but that Prednisone helped.  Plaintiff reported depression,

however, which improved after stopping Prednisone; but that hair loss and

arthralgias then recurred.  Physical examination was unchanged from the last visit.

Dr. Garriga diagnosed plaintiff with autoimmune disease characterized by alopecia

and arthralgias, with steroid side effects.  Dr. Garriga prescribed Tramadol,[13]

Methotrexate,[14] and folic acid.  (Tr. 444-45.)

Plaintiff returned to Dr. Malik on December 1, 2009, who noted plaintiff's

taking of steroid medication to have increased her symptoms of depression with

irritability and suicidal thoughts.  Plaintiff reported the symptoms resolved when

---

[11] The diffuse form of scleroderma is associated with autoantibodies to Scl-70.  *Id.*

[12] Prednisone changes the way the immune system works and treats certain types of arthritis, multiple sclerosis, and lupus.  *Medline Plus* (last reviewed Sept. 1, 2010)<http://www.nlm.nih. gov/medlineplus/druginfo/meds/a601102.html>.

[13] Tramadol (Ultram) is a narcotic analgesic used to relieve moderate to moderately severe pain.  *Medline Plus* (last revised Oct. 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a695011.html>.

[14] Methotrexate (MTX) is used to treat severe active rheumatoid arthritis and other autoimmune diseases by decreasing the activity of the immune system.  *Medline Plus* (last revised May 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682019.html>.

she stopped the medication.  Plaintiff reported her mood to have been mostly okay, but that she is down when she experiences joint pain.  Plaintiff reported her sleep to be fairly stable.  Dr. Malik noted plaintiff's thought processes to be logical and goal directed, with no episodes of mania.  Plaintiff was diagnosed with bipolar disorder and was continued on her medications.  (Tr. 486.)

On January 5, 2010, plaintiff reported to Dr. Garriga that she continued to have stiffness but that the pain in her neck, back, wrists, and knees was much better with Methotrexate.  Plaintiff, however, reported the medication caused nausea.  Plaintiff reported her pain to increase in cold weather.  Plaintiff reported that she exercised daily, but could not lift any weight without pain.  Plaintiff also reported that she had difficulty falling and staying asleep.  Physical examination was unchanged.  Dr. Garriga diagnosed plaintiff with connective tissue disease and bipolar disorder, with medication side effects.  An adjustment was made to the timing of Methotrexate doses, and it was noted that the medication may need to be injected if there was no improvement.  (Tr. 442-43.)

On March 8, 2010, plaintiff complained to Dr. Garriga that she experienced constant pain in her hands, knees, and back.  Plaintiff reported having difficulty grasping objects due to hand pain.  Plaintiff also reported increased fatigue.  Plaintiff wanted to discuss applying for disability.  Physical examination showed plaintiff's right wrist and fingers to be swollen.  Plaintiff's right knee was tender.

Dr. Garriga noted plaintiff to have swollen joints.  Dr. Garriga diagnosed plaintiff with right knee bursitis, bipolar disorder, and asymmetric arthritis - partially responding to MTX.  Plaintiff was instructed to apply ice to the knee.  Knee exercises were also given.  (Tr. 440-41.)

Plaintiff returned to Dr. Malik on March 9, 2010, and reported that Klonopin helped with anxiety and sleep.  Plaintiff reported feeling down and irritable and having poor frustration tolerance.  Plaintiff also reported that she continued to have significant pain, which interfered with her ability to function well.  Plaintiff was continued in her diagnosis of bipolar disorder and was prescribed Seroquel, Lamictal, Zoloft, Ambien, Requip, and Klonopin.[15]  (Tr. 485.)

In a letter dated March 15, 2010, and addressed "To Whom It May Concern," Dr. Malik wrote that she was currently treating plaintiff for bipolar affective disorder.  Dr. Malik further wrote, "It is my opinion that she is unable to work due to her mental illness until further notice."  (Tr. 480.)

On April 20, 2010, plaintiff reported to Dr. Malik that she continued to be in significant pain that was not responding to Ultram.  Plaintiff reported taking Oxycodone[16] for three weeks, which had been given to her by a family member.  Plaintiff reported that the medication helped her pain, which in turn improved her

---

[15] Klonopin is used to relieve panic attacks. *Medline Plus* (last revised July 1, 2010)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html>.

[16] Oxycodone (Oxycontin)--narcotic analgesic to relieve moderate to severe pain. *Medline Plus* (last revised Oct. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/682132.html>.

mood.  It was noted that the pain specialist wanted to clear the use of opiates with Dr. Malik.  Plaintiff reported that her sad mood and crying spells were related to the severity of her pain.  Plaintiff reported that Klonopin improved her sleep. Plaintiff denied any manic/hypomanic episodes.  Plaintiff was continued in her diagnosis and medication regimen.  (Tr. 484.)

On that same date, Dr. Malik spoke with Dr. Garriga and reported that she was comfortable with plaintiff taking narcotic medication and that she would monitor her.  (Tr. 571.)

On May 17, 2010, Dr. Garriga completed a "Multiple Impairment Questionnaire" (MIQ) in which he reported his diagnosis of plaintiff to be undifferentiated connective tissue disease as clinically and diagnostically demonstrated by swollen joints, laboratory testing with positive ANA and Scl-70 antibody, and tender acromial bursa.  Dr. Garriga reported plaintiff's symptoms to include pain, fatigue, swelling, and inability to concentrate.  Dr. Garriga reported that plaintiff experienced daily pain in most muscles and joints, and especially in the shoulder and pelvic area.  Dr. Garriga reported the pain to worsen with prolonged immobility or marked exertion.  Dr. Garriga reported that plaintiff's pain and fatigue rated at a level eight on a scale of one to ten and that medication did not completely relieve plaintiff's pain without unacceptable side effects.  Dr. Garriga opined that plaintiff could sit four hours in an eight-hour workday and

could stand or walk one hour.  Dr. Garriga opined that plaintiff would need to get up and move around for about five minutes every half hour.  Dr. Garriga opined that plaintiff could occasionally lift up to twenty pounds, occasionally carry up to ten pounds, and frequently lift and carry up to five pounds.  Dr. Garriga opined that plaintiff had no significant limitations with repetitive reaching, handling, fingering, or lifting.  He further opined, however, that plaintiff was moderately limited in her ability to grasp, turn, and twist objects; use her fingers or hands for fine manipulations; and use her arms for reaching.  Dr. Garriga reported that plaintiff's condition interfered with her ability to keep her neck in a constant position and that her symptoms would likely increase if she were placed in a competitive environment.  Dr. Garriga opined that plaintiff could not perform full time competitive employment that required activity on a sustained basis.  Dr. Garriga opined that plaintiff's pain, fatigue, or other symptoms were severe enough to frequently interfere with her ability to maintain attention and concentration.  Dr. Garriga reported that plaintiff was not a malingerer.  Dr. Garriga reported that plaintiff also had a psychiatric disease and was capable of performing only low stress work.  Dr. Garriga opined that plaintiff would need to take an unscheduled ten-minute break every two hours during an eight-hour workday.  Dr. Garriga reported that plaintiff's impairments produced good days and bad days and that plaintiff would likely be absent from work two or three times a month because of

her impairments or needed treatment.  Dr. Garriga also reported that plaintiff was prone to infections, because her medication can suppress her immune system.  Dr. Garriga opined that plaintiff needed to avoid fumes, gases, temperature extremes, humidity, dust, and heights; and could engage in no kneeling, bending, or stooping. Dr. Garriga reported that plaintiff began experiencing her symptoms and the described limitations in early 2009 and that her impairments would last at least twelve months.  (Tr. 536-43.)

On June 1, 2010, Dr. Garriga reported to disability determinations that plaintiff experienced knee and back pain, but did not have synovitis.  Dr. Garriga described plaintiff's gait as normal and noted that she did not need an assistive device, but further noted that plaintiff did not have a motor disease.  (Tr. 496.)

On July 29, 2010, Kyle DeVore, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff's bipolar affective disorder and OCD caused mild limitations in activities of daily living; moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace; and resulted in no repeated episodes of decompensation of extended duration.  (Tr. 550-61.)  In a Mental Residual Functional Capacity (RFC) Assessment completed that same date, Dr. DeVore opined that in the domain of Understanding and Memory, plaintiff had no significant limitations.  In the domain of Sustained Concentration and

Persistence, Dr. DeVore opined that plaintiff was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to work in coordination with or proximity to others without being distracted by them, but was not otherwise significantly limited. In the domain of Social Interaction, Dr. DeVore opined that plaintiff was moderately limited in her ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but was otherwise not significantly limited. In the domain of Adaption, Dr. DeVore opined that plaintiff was moderately limited in her ability to travel in unfamiliar places or use public transportation, but was otherwise not significantly limited. Dr. DeVore concluded that plaintiff was capable of simple, repetitive activities with limited contact with the public. (Tr. 547-49.)

Plaintiff returned to Dr. Garriga on August 2, 2010, and reported having stiffness and constant pain in her back, legs, and hands that was worsening. Plaintiff reported having difficulty sleeping because of pain and OCD. It was noted that Dr. Smith recently increased plaintiff's dosage of Oxycontin, which helped the pain and sleeping conditions. Plaintiff reported increased weight gain despite walking several times a week. Dr. Garriga noted increased hair loss to likely be due to medication. Physical examination showed normal joints with no

swelling. Normal range of motion was noted about the hips. Dr. Garriga diagnosed plaintiff with connective tissue disease, fatigue, and Methotrexate hair loss. Plaintiff was instructed to discontinue Methotrexate and to start Plaquenil.[17] (Tr. 569-71.)

Plaintiff visited Dr. Malik on September 21, 2010, and reported having severe depression, increased anxiety, and poor sleep since her husband left in August. Plaintiff reported increased financial stressors with difficulty paying bills. Plaintiff reported increasing her intake of Klonopin and that her symptoms of SLE were exaggerated, with continued symptoms of significant pain for which she took Oxycontin. Plaintiff was continued in her diagnosis of bipolar disorder. She was instructed to increase her dosage of Klonopin. Seroquel, Zoloft, Requip, Lamictal, and Restoril[18] were prescribed. (Tr. 562.)

On November 3, 2010, plaintiff visited Dr. Garriga and reported having stiffness and constant pain in her hands, knees, lower back, and neck, as well as intermittent pain in her feet. Plaintiff reported that she tapered her use of Plaquenil because it caused stomach upset and continued hair loss. Plaintiff reported being stressed because her spouse left. Plaintiff reported an involuntary weight loss of

---

[17] Plaquenil (hydroxychloroquine) is used to treat systemic lupus erythematosus (SLE) and rheumatoid arthritis in patients whose symptoms have not improved with other treatments. *Medline Plus* (last reviewed Sept. 1, 2010)< http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a601240.html>.

[18] Restoril is used to treat insomnia. *Medline Plus* (last revised Feb. 1, 2011)<http://www.nlm. nih.gov/medlineplus/druginfo/meds/a684003.html>.

twenty-three pounds.  Dr. Garriga noted plaintiff to be tearful.  Examination of the joints yielded normal results.  (Tr. 568-69.)

Plaintiff visited Dr. Smith on January 4, 2011, for completion of disability paperwork.  It was noted that plaintiff's joint pain and soft tissue pain were progressive and that her symptoms were less controlled, even with Oxycontin.  Plaintiff reported that she continued to take Tramadol.  Physical examination showed plaintiff's hands to have mild joint inflammation at the IP joints.  Plaintiff had an antalgic gait and was noted to exhibit pain when getting up and down from the chair.  Dr. Smith diagnosed plaintiff with connective tissue disease, bipolar affective disorder, and chronic low back pain.  Dr. Smith was not willing to increase plaintiff's Oxycontin, and he instructed plaintiff to follow up with her psychiatrist and rheumatologist.  (Tr. 578.)

In an MIQ completed that same date, Dr. Smith reported plaintiff's diagnoses to be connective tissue disease, bipolar disorder, chronic low back pain, and seizure disorder, which were clinically demonstrated by swollen joints in the hands, and tests showing positive ANA and Scl-70.  Dr. Smith reported plaintiff's symptoms to include persistent fatigue and diffuse joint and soft tissue pain in the hands, knees, and ankles.  Dr. Smith reported plaintiff's pain to consist of constant aching joints in the hands, knees, ankles, and lower back.  Dr. Smith reported the pain to worsen with increased activity and that emotional stress also contributed to

plaintiff's pain. Dr. Smith reported plaintiff's pain to be at a level seven and her fatigue to be at a level nine on a scale of one to ten and that medication did not completely relieve her pain without unacceptable side effects. Dr. Smith opined that plaintiff could sit no more than one hour in an eight-hour workday and could stand or walk one hour. Dr. Smith opined that plaintiff would need to get up and move around for about fifteen to twenty minutes every half hour. Dr. Smith opined that plaintiff could occasionally lift and carry up to ten pounds, and frequently lift and carry up to five pounds. Dr. Smith opined that plaintiff had significant limitations with repetitive reaching, handling, fingering, or lifting because of pain when opening and closing her hands. Dr. Smith opined that such limitations were marked with grasping, turning, and twisting objects and with using her fingers or hands for fine manipulations. Dr. Smith opined that plaintiff had minimal limitations in using her arms for reaching. Dr. Smith noted plaintiff's medications to include Oxycontin, Temazepam (Restoril), Tramadol, Clonazepam (Klonopin), Plaquenil, Zoloft, Seroquel, Requip, and Lamictal. Dr. Smith reported that plaintiff's condition interfered with her ability to keep her neck in a constant position and that her symptoms would likely increase if she were placed in a competitive environment. Dr. Smith opined that plaintiff could not perform full time competitive employment that required activity on a sustained basis. Dr. Smith opined that plaintiff's pain, fatigue, or other symptoms were severe enough

to constantly interfere with her ability to maintain attention and concentration. Dr. Smith reported that plaintiff was not a malingerer. Dr. Smith reported that plaintiff had anxiety involving interaction with other people that contributed to the severity of her symptoms and functional limitations. Noting plaintiff to decompensate with minimal life stressors, Dr. Smith opined that plaintiff was incapable of performing even low stress work. Dr. Smith opined that plaintiff would need to take a fifteen-minute unscheduled break every hour during an eight-hour workday. Dr. Smith reported that plaintiff's impairments produced good days and bad days and that plaintiff would likely be absent from work more than three times a month as a result of her impairments or her need for treatment. Dr. Smith opined that plaintiff needed to avoid heights and could engage in no kneeling, bending, stooping, pulling, or pushing. Dr. Smith reported that plaintiff began experiencing her symptoms and the described limitations in 2009 and that her impairments would last at least twelve months. (Tr. 579-86.)

Plaintiff returned to Dr. Malik on February 15, 2011, and reported having a depressed mood. Plaintiff also reported being distracted and unable to finish tasks. Plaintiff complained of excessive anxiety and increased panic attacks and reported that she was taking Klonopin regularly. Plaintiff also reported having continued joint pain for which she was seeing Dr. Smith for pain management. Dr. Malik diagnosed plaintiff with bipolar disorder/depressed and continued to prescribe

Seroquel, Klonopin, Zoloft, Requip, Restoril, and Lamictal.  Plaintiff was encouraged to participate in counseling.  (Tr. 587.)

On February 16, 2011, plaintiff reported to Dr. Garriga that she experienced stiffness and constant pain in her neck, lower back, knees, ankles, and hands and that the pain increased with activity.  Plaintiff reported the pain in her right hand to keep her awake at night.  Dr. Garriga noted plaintiff to visit Dr. Smith for pain management.  Plaintiff also reported experiencing severe fatigue, hair loss, gastrointestinal symptoms attributed to Plaquenil, infections, pruritis, nodules on her fingers, and palpitations.  Plaintiff was also concerned about weight gain.  Dr. Garriga noted plaintiff to be very emotional.  Examination showed Tinel's test to be positive on the right.  Otherwise, examination of the joints was normal with no swelling or tenderness noted.  Plaintiff was diagnosed with connective tissue disease and carpal tunnel syndrome on the right.  An injection was administered to the right wrist.  Plaintiff was instructed to discontinue Plaquenil.  (Tr. 592-93.)

Plaintiff returned to Dr. Malik on April 12, 2011, and reported that she continued to feel very depressed with crying spells and feelings of anhedonia, hopelessness, and worthlessness.  Dr. Malik noted plaintiff to have poor self-esteem and self-confidence.  Plaintiff reported panic attacks had lessened with the use of Klonopin.  Plaintiff reported that she continued to think of her husband and the loss of their marriage.  Plaintiff was continued in her diagnosis and medication

regimen.  (Tr. 587-88.)

Plaintiff visited Dr. Garriga on June 2, 2011, and reported continued stiffness.  Plaintiff also reported worsening pain in her right knee and hand. Plaintiff expressed concern about falling and tripping over things because of fatigue, with related concerns regarding her ability to care for her two-year-old daughter.  Plaintiff reported having difficulty functioning throughout the day and that she had very few "good" days.  Plaintiff also reported a recent bout with bronchitis, swelling in her hands and ankles, recurrent rash, and painful nodules on her fingers.  Examination of the joints was normal with no tenderness noted. Plaintiff was noted to have many tight muscle groups.  Dr. Garriga diagnosed plaintiff with myofascial pain with positive ANA.  (Tr. 590-92.)  Dr. Garriga noted plaintiff's lack of energy to remain unexplained, but that four of plaintiff's medications were sedating.  He recommended that plaintiff discuss this issue with the prescribing doctor.  (Tr. 599.)

On June 20, 2011, Dr. Garriga noted recent blood tests to show low levels of immunoglobulin, possibly accounting for the frequency of plaintiff's infections. Dr. Garriga recommended that plaintiff undergo a thorough allergy/immunology workup.  (Tr. 598.)[19]

_____

[19] The record shows plaintiff to have undergone such allergy testing in August 2011 (Tr. 691-92) with follow up treatment in October 2011 (Tr. 678).

Plaintiff met with licensed clinical social worker Bonnie Wessler on July 23, 2011, who noted plaintiff's divorce to have been completed the previous day. Plaintiff reported having been diagnosed with depression and bipolar disorder. Plaintiff also reported chronic pain, and Ms. Wessler noted plaintiff to be uncomfortable while sitting during the session because of pain. Plaintiff reported that she wanted to learn how to cope better, and Ms. Wessler noted her to be motivated for treatment. Plaintiff had thoughts of self-harm, but reported no plan or intent. (Tr. 675.)

In August and September 2011, plaintiff visited Ms. Wessler on five occasions during which she continued to express anger, sadness, and worry regarding her divorce, her children, and her chronic pain. Ms. Wessler noted that chronic pain prevented plaintiff from identifying anything that would make her feel better. Plaintiff reported being a perfectionist and that she was having a hard time not doing things perfectly because of her health condition. During episodes of feeling "better," Ms. Wessler noted that plaintiff nevertheless continued to have many complaints. Plaintiff reported that she would never kill herself, because she would not put her children through that circumstance. (Tr. 675.)

Plaintiff returned to Dr. Malik on October 10, 2011, and reported that she continued to feel depressed and that her anxiety level was increasing. Plaintiff reported that everything in life was overwhelming. Plaintiff reported having

difficulty leaving her house and that she had more anxiety in social situations. Plaintiff reported having occasional anger, but denied any symptoms of mania. Plaintiff reported being unable to enjoy food or a recent visit from her sister. Plaintiff had increased difficulty with sleep, even with medication. Dr. Malik diagnosed plaintiff with bipolar disorder with depressed mood. Plaintiff was prescribed Seroquel, Requip, Restoril, Lamictal, and Viibryd[20] and was to taper Zoloft. Plaintiff was instructed to increase her use of Klonopin. (Tr. 661.)

Plaintiff was admitted to the emergency room at St. Joseph Hospital West on October 19, 2011, for an intentional overdose of Oxycontin. Plaintiff reported that she wanted to die, took twenty-six Oxycontin tablets, and was upset that she was not successful in her attempt. Plaintiff was noted to be very combative and agitated, and she was placed in restraints. Plaintiff's past medical and psychiatric history was noted. During psychological assessment, plaintiff reported increased stress and depression related to her recent divorce and family discord, including being excluded from family functions. Plaintiff was noted to feel helpless and hopeless. Plaintiff was sad and tearful, disheveled in appearance, and curled up on a stretcher during the assessment. Later monitoring and assessment showed plaintiff to be tearful and sedated but cooperative. Her mood, memory, affect, and judgment were normal, and her vital signs were stable. Plaintiff was alert and

---

[20] Viibryd is used to treat depression. *Medline Plus* (last revised Apr. 13, 2012)<http://www.

oriented, and it was determined that she was medically stable.  Plaintiff was discharged on October 20.  It was noted that she would be voluntarily admitted to another facility.  (Tr. 614-29, 697-739.)

Plaintiff visited Ms. Wessler on October 22, 2011, and reported having recently taken ten Oxycontin after which she was hospitalized.  Plaintiff expressed anger that her ex-husband called the Division of Family Services on account of the incident.  Plaintiff reported that she now realized that she did not want to kill herself and wanted to be more assertive in changing her life.  Plaintiff sounded more determined to make positive changes.  One week later, Ms. Wessler noted plaintiff was somewhat down, however, she wanted to find ways to be happy.  (Tr. 675-76.)

In a letter dated November 8, 2011, Dr. Garriga wrote that the findings and limitations set out in his May 2010 MIQ remained in effect.  (Tr. 639.)

On November 12, 2011, plaintiff visited Ms. Wessler and denied any suicidal ideation.  Plaintiff reported that she was handling issues regarding her ex-husband and custody matters more assertively.  Plaintiff sounded depressed, but was more motivated.  Plaintiff reported that her doctor could not give her more pain medication for her lupus, because of her immune system.  Ms. Wessler noted plaintiff to continue to be uncomfortable sitting because of pain.  (Tr. 676.)

---

nlm.nih.gov/medlineplus/druginfo/meds/a611020.html>.

In a letter dated November 17, 2011, Dr. Smith wrote that plaintiff's significant limitations were outlined in his January 2011 MIQ. (Tr. 640.)

Plaintiff visited Ms. Wessler on December 2, 2011, who noted plaintiff to be in substantial pain and to be tearful at times. Plaintiff reported having no control over her life, being in constant pain, and feeling like a failure inasmuch as she no longer excels at things and cannot do much. (Tr. 676.)

In a letter dated December 9, 2011, Dr. Garriga wrote that the findings and limitations set out in his May 2010 MIQ remained in effect. (Tr. 650.)

On December 20, 2011, Ms. Wessler noted plaintiff to appear sad. Plaintiff was concerned that she would be homeless inasmuch as payments had not been made on the house. Plaintiff also reported being sad and angry over her poor relationship with her boyfriend. Ms. Wessler noted plaintiff to appear very motivated to address issues, however, she was overwhelmed with how to do it. (Tr. 676.)

In a "Psychiatric/Psychological Impairment Questionnaire" (PPIQ) completed December 23, 2011 (Tr. 651-658), Ms. Wessler wrote that she had been seeing plaintiff approximately once a week since July 23, 2011, for her diagnosed condition of bipolar disorder. Ms. Wessler noted plaintiff's primary symptoms to include depressed mood, extreme mood fluctuations, flashbacks, lack of restful sleep, appetite fluctuation, panic attacks, irritability, suicidal ideation, and one

suicide attempt.  Ms. Wessler opined that plaintiff's prognosis was poor.  In the

domain of Understanding and Memory, Ms. Wessler opined that plaintiff was

markedly limited in her ability to understand and remember one- or two-step

instructions and detailed instructions.  Ms. Wessler further opined that plaintiff was

moderately limited in her ability to remember locations and work-like procedures.

In the domain of Sustained Concentration and Persistence, Ms. Wessler opined that

plaintiff was markedly limited in her ability to carry out detailed instructions,

maintain attention and concentration for extended periods, perform activities

within a schedule, maintain regular attendance, be punctual within customary

tolerances, complete a normal workweek without interruptions from

psychologically-based symptoms, and perform at a consistent pace without an

unreasonable number and length of rest periods.  Ms. Wessler further opined that

plaintiff was mildly limited in her ability to make simple work-related decisions

and moderately limited in her ability to carry out simple one- or two-step

instructions, sustain an ordinary routine without supervision, and work in

coordination with or proximity to others without being distracted by them.  In the

domain of Social Interaction, Ms. Wessler opined that plaintiff was markedly

limited in her ability to get along with coworkers or peers without distracting them

or exhibiting behavioral extremes, maintain socially appropriate behavior, and

adhere to basic standards of neatness and cleanliness.  Ms. Wessler further opined

that plaintiff was moderately limited in her ability to interact appropriately with the general public, mildly limited in her ability to accept instructions and respond to criticism from supervisors, and not limited in her ability to ask simple questions or request assistance. In the domain of Adaptation, Ms. Wessler opined that plaintiff was markedly limited in her ability to respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently. Ms. Wessler further opined that plaintiff was moderately limited in her ability to be aware of normal hazards and take appropriate precautions. Ms. Wessler reported that plaintiff experienced episodes of deterioration or decompensation in work or work-like settings that cause her to withdraw or experience exacerbations of signs and symptoms. (Tr. 651-56.) Ms. Wessler also opined that plaintiff was "markedly limited in her ability to sustain employment of any type due to depression, anxiety [and] mood swings." (Tr. 656.) Ms. Wessler reported that plaintiff was not a malingerer. Ms. Wessler opined that plaintiff was not capable of even low stress jobs noting that plaintiff functioned minimally at home, which made it unlikely that she could cope with the addition of any work stresses. Ms. Wessler opined that plaintiff would be absent from work more than three times each month as a result of her impairments and treatment needs. Ms. Wesler noted that plaintiff's impairments and symptoms were ongoing, had worsened since her teenage years, and were expected to last at least twelve

months.  (Tr. 656-58.)

In an undated narrative report, Dr. Garriga wrote that he first saw plaintiff in September 2009 with complaints of joint and muscle pains, fatigue, dry eyes, dry mouth, diffuse swelling, and weakness; and that examination showed several swollen joints, with positive ANA and Scl-70 tests.  Dr. Garriga reported that he diagnosed undifferentiated connective tissue disease and prescribed Prednisone, hydroxychloroquine, and Methotrexate, which improved plaintiff's condition but that some pain and swollen joints remained.  Dr. Garriga also reported that plaintiff had been prescribed long-acting narcotics due to persistent pain.  Dr. Garriga reported that he sees plaintiff every four months with frequent monitoring of her blood.  Dr. Garriga reported,

> I have not conducted a full work evaluation on her.  I know that she has pain and that she feels the pain and the medicine interfere with her ability to perform her duties.  The patient's condition is chronic.  I do not expect it to go away.  From my standpoint her disease has lasted at least a year.  I expect to continue to follow her in my office on a chronic basis.

(Tr. 395.)

## IV.  Medical Evidence Considered by the Appeals Council[21]

Plaintiff visited Dr. Malik on January 19, 2012, and reported continued

---

[21] This evidence was not before the ALJ at the time of her decision but was submitted to and considered by the Appeals Council on plaintiff's request to review the ALJ's decision.  As a result, this Court must consider it in determining whether the ALJ's decision was supported by substantial evidence.  *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

periods of depression, "dark days," and pervasive suicidal thoughts. Plaintiff reported having more mood instability with periods of hypermania, irritability, and increased energy, but that the periods of depression were lasting longer. It was noted that plaintiff was attending individual weekly therapy sessions. Plaintiff was continued in her diagnosis of bipolar disorder and was prescribed Viibryd, Seroquel, Requip, Lamictal, and Klonopin. (Tr. 743.)

On March 13, 2012, Dr. Malik noted plaintiff to be experiencing an increase in anxiety and OCD with compulsive checking. Plaintiff reported not taking Trazodone, because of her fear that she would not be able to wake up with her daughter. Plaintiff reported having newer paranoid thoughts and auditory hallucinations. Plaintiff's mood was noted to still be depressed. Plaintiff denied any mood swings. Dr. Malik noted that plaintiff was prescribed Oxycontin and Tramadol for pain. Plaintiff was continued in her diagnosis and medication regimen, with instruction to increase her Seroquel. (Tr. 742.)

On April 26, 2012, plaintiff reported to Dr. Malik that she had to decrease the Seroquel back to its original dosage because the increased dosage made her more irritable. Plaintiff reported having continued obsessive thoughts as well as depression with crying spells. Plaintiff reported that her mood was related to environmental and financial issues. Dr. Malik noted plaintiff to have chronic pain because of connective tissue disorder and that she continued to take Oxycontin as

prescribed by Dr. Smith.  No changes were made to plaintiff's treatment regimen. (Tr. 742.)

Plaintiff returned to Dr. Malik on May 21, 2012, who noted plaintiff to have recently been to the emergency room after an assault by her boyfriend.  It was noted that plaintiff was seen by a neurologist and was given Dilantin, but that she did not take the medication because of drug interactions.  Plaintiff reported that she stopped taking Requip but experienced poor sleep due to her RLS.  Plaintiff complained of excessive fatigue caused by her connective tissue disorder.  Plaintiff denied any suicidal thoughts.  Plaintiff was instructed to continue with her medication and with her therapy sessions with Ms. Wessler.  It was noted that Dr. Malik would coordinate care with the neurologist.  (Tr. 741.)

## V.  The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 21, 2013.  The ALJ found plaintiff not to have engaged in substantial gainful activity since August 1, 2008, the alleged onset date of disability.  The ALJ found that plaintiff had the severe impairments of undifferentiated and mixed connective tissue disease, depression, bipolar disorder, anxiety, and OCD, but that she did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 161-62.)  The ALJ found that plaintiff had the

RFC to perform light work[22] except that she

> cannot climb ladders, ropes, or scaffolds. The claimant can
> understand, remember, and carry out at least simple instructions and
> non-detailed tasks. However, she should not work in a setting, which
> includes constant/regular contact with the public, and should not
> perform work, which includes more than infrequent handling of
> customer complaints.

(Tr. 164.) The ALJ determined that plaintiff was unable to perform any past

relevant work. Considering plaintiff's age, education, work experience, and RFC,

the ALJ determined that vocational expert testimony supported a finding that

plaintiff could perform other work that exists in significant numbers in the national

economy, and specifically, production assembler, housekeeper, and folding

machine operator. The ALJ thus found that plaintiff had not been under a

disability since August 1, 2008, through the date of the decision. (Tr. 168-70.)

## VI. Discussion

To be eligible for DIB under the Social Security Act, plaintiff must prove

that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001);

*Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).

Under the Act, "disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental

---

[22] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner engages in a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Step 1 considers whether the claimant is engaged in substantial gainful activity. If so, disability benefits are denied. At Step 2, the Commissioner decides whether the claimant has a "severe" medically determinable impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. If the impairment(s) is severe, the Commissioner then determines at Step 3 whether such impairment(s) is equivalent to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) meets or equals one of the listed impairments, she is conclusively disabled. At Step 4, the Commissioner establishes whether the claimant's impairment(s) prevents her from performing her past relevant work. If

the claimant can perform such work, she is not disabled. Finally, if the claimant is unable to perform her past work, the Commissioner continues to Step 5 and evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. The claimant is entitled to disability benefits only if she is not able to perform other work.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

As set out above, plaintiff argues that the ALJ failed to properly weigh the opinion evidence of record when determining her RFC and erred in her analysis finding plaintiff's subjective complaints not to be credible. Plaintiff's claims are well taken. Because the ALJ's decision is not supported by substantial evidence on the record as a whole, the decision is reversed and the matter remanded to the Commissioner for further proceedings.

A.    Credibility

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider all evidence relating to the claimant's subjective complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing her reasons for discrediting the testimony. *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the

inconsistencies in the evidence presented and discuss the factors set forth in *Polaski* when making credibility determinations." *Cline*, 939 F.2d at 565; *see also Renstrom*, 680 F.3d at 1066; *Beckley v. Apfel*, 152 F.3d 1056, 1059-60 (8th Cir. 1998). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001); *see also Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. *Tellez,* 403 F.3d at 957; *Pearsall*, 274 F.3d at 1218.

Here, the ALJ pointed to inconsistencies in the record that detracted from plaintiff's credibility. However, a review of the entirety of the record shows the ALJ's analysis to be flawed. Several of the alleged inconsistencies relied on by the ALJ are not supported by the record and indeed, in some instances, are contrary to the record. Because these discrepancies undermine the ALJ's ultimate conclusion that plaintiff's impairments are less severe than she claims, the matter must be remanded for reconsideration of plaintiff's credibility and for a more complete review of the record. *Baumgarten v. Chater*, 75 F.3d 366, 368-69 (8th Cir. 1996).

First, the ALJ asserted that the medical evidence did not support plaintiff's claims of a disabling physical impairment, finding that plaintiff received only conservative treatment, was "merely prescribed" pain medication, and did not

participate in any physical therapy, undergo invasive surgery, or receive epidural/steroid injections. The ALJ also found the treatment history for plaintiff's physical impairments to be "limited" and that diagnostic tests were "mostly normal." (Tr. 165.) A review of the record as a whole shows these findings not to be supported by, and indeed to be contrary to, substantial evidence.

With respect to plaintiff's medications, the record shows powerful, narcotic pain medication to have been prescribed for moderate to severe pain since at least 2009. Although plaintiff experienced some initial relief, the record shows that she nevertheless experienced worsening pain over time despite continued use of such medication. In *O'Donnell v. Barnhart*, 318 F.3d 811 (8th Cir. 2003), the Eighth Circuit noted that the claimant's chronic use of Oxycodone, "a narcotic similar to morphine," actually supported her allegations of pain instead of detracted from them. *Id.* at 817. Given plaintiff's chronic use of this same medication here, with evidence that it did not provide full relief, it cannot be said that her being "merely prescribed" pain medication serves to discredit her complaints of pain.

In addition, while the ALJ acknowledged plaintiff's medications to also include Prednisone, hydroxychloroquine, and Methotrexate, she wholly failed to consider the adverse side effects plaintiff experienced with these medications – including increased depression and suicidal thoughts, nausea, suppressed immune system, gastrointestinal upset, and hair loss – which led to them being discontinued

altogether.  Further, when addressing plaintiff's complaints of fatigue, Dr. Garriga

noted that many of plaintiff's medications caused sedation.  The ALJ failed to

address this side effect as well.  An ALJ is required to consider medication side

effects in the credibility analysis.  *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir.

1997).

      To the extent the ALJ discredited plaintiff's subjective complaints because

of her failure to attend physical therapy, undergo surgery, or receive injections, the

record does not show that plaintiff's healthcare providers recommended such

treatment methods or considered them appropriate for plaintiff's autoimmune

disorder.  An "ALJ's reliance on . . . [her] own beliefs as to what the medical

evidence should show do[es] not constitute substantial evidence" to support a

conclusion that a claimant has the RFC to perform work-related activities.  *Fowler

v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989).  Nor may an ALJ "play doctor" and

substitute her opinion for that of a medical professional.  *See Pate-Fires v. Astrue*,

564 F.3d 935, 946-47 (8th Cir. 2009) (citing *Rohan v. Chater*, 98 F.3d 966, 970

(7th Cir. 1996)); *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990).  No medical

report of record suggests that plaintiff has not been pursuing a valid course of

treatment.  Nor have any of plaintiff's doctors questioned the severity of plaintiff's

impairments.  In such circumstances, it was error for the ALJ to discredit plaintiff's

complaints on account of her failure to pursue other modes of treatment.  *See Tate*

*v. Apfel*, 167 F.3d 1191, 1197-98 (8th Cir. 1999).

The ALJ also discredited plaintiff's subjective complaints relating to her mental impairments, finding that plaintiff received only sporadic treatment, failed to take her medication, failed to appear for appointments during a five-month period in 2010, and did not maintain a consistent relationship with a therapist. The ALJ further stated that the record showed plaintiff to be stable and that conservative treatment improved her condition. (Tr. 166.) A review of the record belies these findings.

The evidence before the ALJ shows that over a four-year period, plaintiff visited her treating psychiatrist, Dr. Malik, on no less than eighteen occasions, during which time her psychotropic medications were repeatedly adjusted, including consistent increases in dosages because of continued symptoms despite treatment.[23] Plaintiff's "failure" to see Dr. Malik for a five-month period in 2010 does not constitute a failure to comply with treatment such that her complaints are not credible. The record shows that no appointments with Dr. Malik were scheduled during this time, and plaintiff otherwise saw this doctor on average about every three months. In addition, the ALJ cites to Dr. Malik's treatment records from April 2010 and from February and April 2011 to support her statement that plaintiff's "physicians noted her failure to take her medication[.]"

_____

[23] The additional evidence considered by the Appeals Council shows continued treatment by Dr.

(Tr. 166, citing the administrative record at Exh. 13F/2 and 17F/1.)  A review of these records, however, shows them not to contain any such notes or any evidence that plaintiff failed to comply with prescribed treatment.  (*See* Tr. 563 (Exh. 13F/2), 587 (Exh. 17F/1).)  Finally, the record shows that, upon Dr. Malik's recommendation that plaintiff seek counseling, she indeed began such counseling with Ms. Wessler in July 2011 and saw her on at least eleven occasions through December 2011.  Although the relationship with Ms. Wessler may not necessarily be characterized as lengthy, it was initiated following Dr. Malik's recommendation and was consistent (eleven visits over a five-month period) through the time of the hearings before the ALJ.  Such evidence runs counter to the ALJ's statement that plaintiff had no consistent relationship with a therapist.  Where alleged inconsistencies upon which an ALJ relies to discredit a claimant's subjective complaints are not supported by and indeed are contrary to the record, the ALJ's ultimate conclusion that the claimant's symptoms are less severe than she claims is undermined.  *Baumgarten,* 75 F.3d at 368-69.

In light of the above, it cannot be said that the ALJ demonstrated in her written decision that she considered all of the evidence relevant to plaintiff's complaints or that the evidence she considered so contradicted plaintiff's subjective complaints that plaintiff's testimony could be discounted as not credible.

Malik through May 2012, with an increase in the frequency of visits.

*Masterson v. Barnhart*, 363 F.3d at 731,738-39 (8th Cir. 2004); *Baumgarten*, 75

F.3d at 370. As such, the ALJ's adverse credibility determination is not supported

by substantial evidence on the record as a whole. Because the ALJ's decision fails

to demonstrate that she considered all of the evidence before her under the

standards set out in *Polaski*, this cause should be remanded to the Commissioner

for an appropriate analysis of plaintiff's credibility in the manner required by and

for the reasons discussed in *Polaski*.

B.      Opinion Evidence

Upon concluding that plaintiff's subjective complaints were not credible, the

ALJ turned to the opinions rendered by Dr. Smith, Dr. Garriga, and Ms. Wessler

and determined to accord these opinions little weight inasmuch as they were

dependent upon plaintiff's less-than-credible complaints. (Tr. 167.) Because the

ALJ's adverse determination of plaintiff's credibility was faulty, discounting

opinion evidence on this basis was error. *See Singh v. Apfel*, 222 F.3d 448, 452

(8th Cir. 2000).

To the extent the ALJ also discounted Dr. Smith's opinion for the reason

that he had not treated plaintiff since 2009 (Tr. 167), this finding is directly refuted

by the record given Dr. Smith's most recent recorded treatment of plaintiff in

January 2011. To the extent the ALJ discounted Dr. Garriga's opinion inasmuch

as his treatment notes do not reflect his opined restrictions, "[i]t does not seem

unusual that a physician would see no need to make specific treatment notes on an unemployed patient's need for work [restrictions] during a routine medical examination." *Leckenby v. Astrue*, 487 F.3d 626, 633 n.7 (8th Cir. 2007). This is especially true here where plaintiff's medical records with Dr. Garriga are replete with consistent complaints of chronic stiffness and pain, chronic fatigue, and worsening symptoms despite two years of treatment. *See id.* at 633. Indeed, plaintiff's treating psychiatrist observed these same symptoms and complaints of pain and fatigue during her long-term treatment of plaintiff. It cannot be said therefore, that the limitations opined in Dr. Garriga's MIQ find no support in his treatment notes or other evidence of record. *Id.*

Other than providing reasons to discount opinion evidence relating to plaintiff's physical impairments, the ALJ's RFC analysis contains no discussion or recitation of any evidence as it relates to plaintiff's physical RFC, that is, what she is able to do despite her physical impairments. "[D]rawing a conclusion regarding credibility is not equivalent to proving by medical evidence that a claimant has the residual functional capacity for other work." *Estabrook v. Apfel*, 14 F. Supp. 2d 1115, 1122 (S.D. Iowa 1998), *cited approvingly in Graham v. Colvin*, No. 4:12-cv-00863-SPM, 2013 WL 3820613, at *7 (E.D. Mo. July 23, 2013) (memorandum opinion). The ALJ made a similar error as was found in *Estabrook*—that is "under the guise of a credibility finding[. . .she] substitute[d] her judgment for that of the

physicians." *Estabrook*, 14 F. Supp. 2d at 1122. It is the law of the Eighth Circuit "that the ALJ must not substitute [her] opinion for those of the physicians." *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990). The ALJ's RFC assessment must discuss and describe how the evidence *supports* each conclusion and must cite specific medical facts and nonmedical evidence in doing so, as well as resolve any material inconsistencies or ambiguities in the evidence of record. Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996). The reports from the plaintiff's treating physicians all contain objective medical findings, as well as conclusions that the plaintiff is not malingering. (Dr. Garriga's Multiple Impairment Questionaire dated May 17, 2010,Tr.536-43; Dr. Smith's Multiple Impairment Questionaire dated January 4, 2011, Tr. 579-86; and Dr. Wessler's Psychiatric/ Psychological Impairment Questionaire dated December 23, 2011, Tr. 651-58.)

With respect to opinion evidence relating to plaintiff's mental impairment, the ALJ determined to discount Ms. Wessler's PPIQ reasoning that if plaintiff were as limited as Ms. Wessler opined, she would be hospitalized or meet the listings. The ALJ further opined that if Ms. Wessler believed plaintiff's complaints, "she should have referred her" for more intensive treatment, prescription adjustment, or hospitalization. (Tr. 167.) As noted above, however, an ALJ is not permitted to "play doctor" and substitute her opinion for that of a medical professional. *See*

*Pate-Fires,* 564 F.3d at 946-47 (citing *Rohan,* 98 F.3d at 970); *Ness,* 904 F.2d at 435.

To support her mental RFC assessment, the ALJ credited and gave great weight to the opinion of the State agency psychological consultant, Kyle DeVore, who opined in July 2010 that plaintiff had the mental RFC to perform simple, repetitive tasks with limited contact with the public. (Tr. 167-68.) As noted by the plaintiff, however, at the time Dr. DeVore rendered this opinion, he did not have available to him the complete treatment records from Dr. Malik, any treatment records from Ms. Wessler, nor Ms. Wessler's opinion evidence. For the following reasons, according great weight to the opinion of this State agency consultant, while erroneously discounting the opinion of plaintiff's treating source, was error.

Opinions of non-treating, non-examining sources ordinarily do not constitute substantial evidence on the record as a whole and are generally accorded less weight than opinions from examining sources. *Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir. 2010); *Wildman v. Astrue,* 596 F.3d 959, 967 (8th Cir. 2010). This is especially true when evidence contrary to the non-examining source's opinion exists in the record. *See Davis v. Schweiker,* 671 F.2d 1187, 1189 (8th Cir. 1982). When evaluating the opinion of a non-examining source, the ALJ must evaluate the degree to which the opinion considers all of the pertinent evidence, including opinions of treating and other examining sources. *Wildman,* 596 F.3d at 967; 20

C.F.R. § 404.1527(d)(3) (2011). In addition, where the non-examining source did not have access to relevant medical records, the opinion is accorded less weight. *See McCoy v. Astrue,* 648 F.3d 605, 616 (8th Cir. 2011).

Here, Dr. DeVore rendered his opinion in July 2010 and thus did not have access to a number of significant medical records created thereafter that showed additional psychiatric treatment, counseling sessions occurring weekly or every other week, continual prescriptions for and adjustments to psychotropic medications, plaintiff's transient response and continued symptoms despite medication compliance, and a suicide attempt. Because Dr. DeVore did not have access to these relevant records when he rendered his opinion, the opinion of this non-examining consultant is entitled to less weight. *McCoy*, 648 F.3d at 616. In addition, Dr. DeVore did not have the opportunity to consider the opinion of plaintiff's treating mental health source inasmuch as such opinion was rendered in December 2011, that is, seventeen months after Dr. DeVore's opinion. The ALJ did not consider Dr. DeVore's lack of access to this opinion evidence and, as discussed *supra*, provided an improper basis upon which to discount such evidence. To accord great weight to Dr. DeVore's opinion evidence in these circumstances was error. *See Wildman,* 596 F.3d at 967; *Davis,* 671 F.2d at 1189.

C.      RFC Assessment

Because "[s]ubjective complaints . . . are often central to a determination of

a claimant's RFC," *Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004), an ALJ's RFC assessment based on a faulty credibility determination is called into question because it does not include all of the claimant's limitations. *See Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2001). This is especially true where an ALJ fails to properly consider evidence of a claimant's mental impairment. *See Pate-Fires*, 564 F.3d at 944-45 (ALJ's failure to properly evaluate evidence of mental impairment resulted in RFC not supported by substantial evidence); ); *cf. Delrosa v. Sullivan*, 922 F.2d 480, 485-86 (8th Cir. 1991) (failure to properly consider mental impairment may have resulted in credibility analysis that failed to examine possibility that impairment aggravated claimant's sense of pain).

In addition, given the ALJ's improper determination to discount the medical opinions of plaintiff's treating sources, coupled with her unsupported determination to accord great weight to the opinion of a non-examining State agency consultant, it cannot be said that the resulting RFC assessment is supported by substantial evidence on the record as a whole. *See generally Leckenby v.Astrue*, 487 F.3d 626 (8th Cir. 2007).

## VII. Conclusion

The ALJ failed to properly evaluate plaintiff's credibility and improperly analyzed the opinion evidence of record in this case, resulting in an RFC

determination that was not supported by substantial evidence on the record as a whole. The matter will therefore be remanded for further consideration.[24] Although the undersigned is aware that upon remand, the ALJ's decision as to non-disability may not change after properly considering all evidence of record and undergoing the required analysis, *see Pfitzer v. Apfel*, 169 F.3d 566, 569 (8th Cir. 1999), the determination is nevertheless one that the Commissioner must make in the first instance.

Accordingly,

 **IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of March, 2015.

---

[24] The RFC determination must be based on some medical evidence in the record, *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007); and if a treating physician's opinion is discounted, good reasons for doing so. *Holmstrom*, 270 F.3d at 720; *Prosch v. Apfel*, 201 F.3d 1010, 1013-14 (8th Cir. 2000).